1
2
3
4
5

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

6
7

ROBERT TAYLOR, SR., individually and on
behalf of others similarly situated,

Case No. 3:13-cv-05245-KLS

8

                                          Plaintiff,

        v.

ORDER DENYING PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION
WITH LEAVE TO AMEND COMPLAINT

9
10
11

UNIVERSAL AUTO GROUP I, INC., a
Washington corporation, d/b/a TACOMA
DODGE CHRYSLER JEEP,

12

                                          Defendant.

13
14
15

        This matter comes before the Court on plaintiff's filing of a motion for class certification.

16    The parties have consented to have this matter heard by the undersigned Magistrate Judge

17    pursuant to 28 U.S.C. § 636(c), Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 73 and Local

18    Rule MJR 13. After having reviewed plaintiff's motion, defendant's response to that motion,

19    plaintiff's reply thereto and the remaining record, the Court finds that for the reasons set forth

20    below plaintiff's motion should be denied, with leave to amend his complaint to refine the class

21    definitions in accordance with the findings contained herein.

22                            FACTUAL AND PROCEDURAL HISTORY

23    I.      The "Old" Tacoma Dodge Dealership

24
25            For some 25 years prior to 2009, Philip P. Schaefer operated and was the majority owner

26    of a Dodge automobile dealership located in Tacoma, Washington ("old Tacoma Dodge"), under

ORDER - 1

a franchise agreement with Chrysler Corporation[1] ("Chrysler"). See ECF #56, Exhibit 3; ECF #61, p. 1, ¶ 2; ECF #62, p. 1, ¶ 1. In April 2007, old Tacoma Dodge sold plaintiff a Dodge pick-up truck. See ECF #62, p. 2, ¶4. "As part of the information" old Tacoma Dodge "obtained from [plaintiff] in connection with this sale was his [cellular[2]] telephone number, which [was] then included in the Vehicle Buyer's Order . . . prepared in connection with that transaction." Id. at p. 2, ¶ 4, Exhibit A. During the time that old Tacoma Dodge was in business, "[a]n item of information . . . generally obtained from [its] customers was their phone number, as a means of contacting them." Id. at ¶ 3. Plaintiff also signed a "PRIVACY NOTICE" in connection with his April 2007 purchase, in which he acknowledged being informed that any information collected about him may be disclosed "to companies that perform marketing services or other functions on [old Tacoma Dodge's] behalf." ECF #63, p. 1, ¶ 1, Exhibit 1.

II.    The "New" Tacoma Dodge Dealership

In early 2009, Chrysler entered into bankruptcy and terminated many of its automobile dealership franchise agreements, including the one with old Tacoma Dodge. See ECF #29, p. 1, ¶ 1; ECF #61, pp. 1-2, ¶ 3; ECF #62, p. 2, ¶ 5. In June 2009, Chrysler emerged from bankruptcy and awarded Philip W. Bivens a franchise for the Tacoma market area to sell Dodge, Chrysler and Jeep vehicles, which was incorporated as Universal Auto Group I, Inc. in the State of Washington in September 2009. See ECF #56, Exhibit 1; ECF #61, p. 2, ¶ 5. In October 2009, defendant entered into an asset purchase and sale agreement with old Tacoma Dodge to acquire most of old Tacoma Dodge's assets, including its "customer lists and customer files containing

---

[1] Currently named Chrysler Group LLC. See http://www.chryslergroupllc.com/Pages/Home.aspx.

[2] Although the telephone number TAM obtained from plaintiff at the time – (253) 691-6678 – is noted in the section of the Vehicle Buyer's Order reserved for the customer's "Residence phone" (ECF #62, Exhibit A), plaintiff admits that is a cellular number (see ECF #36, p. 7).

ORDER - 2

the names, addresses and contact information" of those customers. ECF #61, pp. 2-3, ¶¶ 7-10, Exhibit 1; ECF #62, p. 2, ¶¶ 6-7.

As a result of that agreement, old Tacoma Dodge's "customer database" was "pushed" to defendant's database electronically. ECF #56, Exhibit 2, Deposition of Steven Mark Crosetti ("Crosetti Dep."), 9:15-20. One such customer record transferred to Tacoma Dodge was the Vehicle Buyer's Order pertaining to plaintiff's April 2007 pick-up truck purchase. ECF #62, p. 2, ¶7. Mr. Bivens wanted old Tacoma Dodge's customer records so he could contact them to "let them know the Dodge dealership was back in business." ECF #61, p. 3, ¶ 10. Mr. Schaefer also was "concerned" that defendant "take care of" old Tacoma Dodge's customers, and wanted Mr. Bivens "to honor commitments [it] had made to its customers," including "free lifetime oil changes," which Mr. Bivens had "agreed . . . to honor" as part of the asset and purchase sale. Id. at ¶ 11; see also ECF #56, Crosetti Dep., 14:6-9 ("Part of [Mr.] Schaefer's . . . main concern was that he had been doing business with costumers for over 25 years, and he wanted to make sure that those people were taken care of.").

Because old Tacoma Dodge's dealership had been terminated, its customers "had no authorized Dodge dealership within the Tacoma market area to have warranty work done, or to have their repairs done." ECF #61, p. 3, ¶ 12. Further, during the fall of 2009, while defendant made efforts to prepare old Tacoma Dodge's former premises for opening, "[a]lmost every day, 'old Tacoma Dodge' customers would come by, knock on the windows and doors and ask if we were open or would be reopening soon." ECF #61, p. 3, ¶ 12.

III.    The 2009 "Welcome" Call

In December 2009, defendant opened for business at the same location as old Tacoma Dodge. See ECF #29, p. 1, ¶¶ 1-2; ECF #61, pp. 3-4, ¶¶ 6-8, 12-13. Upon opening for business,

ORDER - 3

defendant sent the same "welcome" message to the customers of old Tacoma Dodge "to let them know the dealership was now open." ECF #29, p. 1, ¶ 2. That message stated: "Just wanted to let you know, we're back in town, right here at 38th and South Tacoma Way. Drop on in, say 'Hi,' or grab a cup of coffee.'" ECF #56, Crosetti Dep. 15:13-17; see also id. at 17:6-10;  see also ECF #61, p. 4, ¶ 13. Plaintiff was among those customers who received the "welcome" message in December 2009. See ECF #56, Crosetti Dep. 111:15-25, 112:10-22, Exhibit 5; ECF #61, p. 4, ¶ 14. The message was sent to the same cellular number old Tacoma Dodge obtained from plaintiff in connection with the April 2007 transaction. See ECF #63, Exhibit 2.

While customers who received the message and then stopped by would have been able to buy a car if they wanted to, "that wasn't why that message was sent." ECF #56, Crosetti Dep., 17:14-24. Rather it was for old Tacoma Dodge's customers "to simply stop by and realize that Mr. Schaefer had made arrangements for them to be taken care of, although he was no longer the dealer." ECF #61, p. 4, ¶ 13. Nor was the purpose to solicit a return telephone call from those customers. See id. Indeed, it appears no telephone number was provided by defendant in the "welcome" message for old Tacoma Dodge's customers to call. See id. The "welcome" message was recorded by Mr. Bivens via a telephone call made to OneCommand – a Chrysler "preferred vendor" headquartered in Ohio[3] – and then OneCommand sent the message to the telephone numbers from the customer list defendant purchased from old Tacoma Dodge and electronically transferred to OneCommand. ECF #29, pp. 2-3, ¶ 7; ECF #56, Crosetti Dep. 19:13-14, 20:15-25, 21:2-25, 22:2-4, 29:7-12, 16-25.

IV.    The 2011 and 2012 Thank You and Service Reminder Calls

On three occasions during the months of February 2010, and November 2010, plaintiff

---

[3] See http://www.onecommand.com/who-we-are (noting its corporate headquarters is located in Ohio, with regional offices located in California, Illinois and New York).

ORDER - 4

and his wife "had a car serviced by" defendant. ECF #61, p. 4, ¶ 16; <u>see also</u> ECF #29, p. 2, ¶¶ 3, 5-6. It was defendant's policy that each time customers – including plaintiff and his wife – came into the dealership for service work, "to have the service advisor or whomever they dealt with ask them their preferred method of contact, and either note it on the service order or verify its accuracy if it already was preprinted on the service order based upon a prior contact with them in which they provided a number as their preferred method of contact." ECF #61, p. 5, ¶ 17; <u>see also</u> ECF #29, p. 2, ¶¶ 4-5; ECF #56, Crosetti Dep. 35:19-25, 36:1-10, 46:10-16. Defendant's service records show that the same two telephone numbers were provided for plaintiff and his wife each time they brought a vehicle in for service. <u>See</u> ECF #29, p. 2, ¶¶ 4-6, Exhibits 1-3. Both were cellular numbers, one of which was the number that received the "welcome" message in December 2009. <u>See</u> <u>id.</u>; ECF #36, p. 7.

Prior to April or May 2011, defendant used its service personnel to contact customers via their preferred method of contact in regard to service performed on their vehicles. <u>See</u> ECF #56, Crosetti Dep. 55:21-25, 56:1-19. Starting in April or May 2011, defendant "began participating in a call program that Chrysler promoted as fostering positive customer relations" and "to help better customer satisfaction" through OneCommand. ECF #29, p. 2, ¶ 7; ECF #56, Crosetti Dep. 57:15-21, 95:19-25, 96:1-2. Known as the "Chrysler Digital DMS Marketing Program" ("DMS Marketing Program") OneCommand also described it in a "[w]elcome" email to defendant as a "special service" that "will drive sales and service opportunities to your dealership through targeted communications with your customers on a consistent basis in order to increase loyalty, retention and repurchase behavior." ECF #56, Exhibit 9.

Even after it began participating in the DMS Marketing Program, defendant continued to engage in the practice of asking its customers for their preferred method of contact in connection

ORDER - 5

with all sales and services. See ECF #56, Crosetti Dep. 35:20-25, 36:1-10, 57:22-25, 58:1-14. Defendant used the DMS Marketing Program to electronically "push" customer information "on a daily basis" to OneCommand. Id. at 101:23-25. "The push was set up automatically," such that each night after a particular repair order or sales transaction "would close," that information was "pushed to OneCommand." Id. at 102:17-25. Defendant only used the DMS Marketing Program to communicate with its "active database," that is, only with those customers who were "actively engaged" in having services be provided to them by defendant and who had given their preferred method of contact information. Id. at 110:2-18.

From a list of scripted messages OneCommand provided, defendant chose those it wished to record and have automatically sent to its active customers via their preferred method of contact, depending on the service or transaction involved. Id. at 104:18-25, 105:1-7, Exhibit 7; ECF #71, Exhibit 1, Deposition of Eric Frost 38:7-25, 39:1-25, 40:1-10. Plaintiff brought two vehicles in to defendant for maintenance and service work on July 6 and July 7, 2011, records for which indicate the same two telephone numbers were provided as were provided in 2010. See ECF #29, p. 3, ¶¶ 8-10, Exhibits 4-6. OneCommand records also indicate one service thank you call and four additional service reminder calls were made to the same cellular number provided in 2011 and 2012, that plaintiff provided in regard to the April 2007 pick-up truck purchase. See ECF #29, p. 3, ¶¶ 11-12, 14; ECF #61, p. 5, ¶¶ 19, 21; ECF #63, Exhibit 2.

The last service reminder call plaintiff received occurred on July 3, 2012. See ECF #29, p. 4, ¶ 14. That same day, defendant received an email from plaintiff stating it had violated the law and asking for money damages. See ECF #1, p. 5, ¶ 6.5; ECF #29, ¶ 14. Upon receipt of that email, defendant notified plaintiff that it would remove him "from the service reminder call program," and also "notified OnceCommand to remove him, which it did." ECF #29, p. 4, ¶ 14.

In October 2013, due to a change in Chrysler's customer relations program "from telephone to e-mail," defendant "ended its participation in the call program at that time." <u>Id.</u> at ¶ 16. Because of this, defendant's customers no longer may receive reminders by telephone. <u>See id.</u>

V.     <u>Plaintiff's Class Action Complaint</u>

On April 1, 2013, plaintiff filed a class action complaint with this Court against defendant for violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.*, the Washington Automatic Dialing and Announcing Device statute ("WADAD"), RCW 80.36.400, and the Washington Consumer Protection Act ("WCPA"), RCW 19.86 *et seq.*, seeking damages as well as declaratory and injunctive relief. <u>See</u> ECF #1. In his complaint, plaintiff defines both a National Class and a Washington State Subclass:

> <u>National Class</u>: All persons in the United States who received a call on their cellular telephone line with a prerecorded message, initiated by or on behalf of Defendant, marketing Defendant's products and services, and without the recipient's prior express consent, at any time in the period that begins four years from the date of this complaint to trial.
>
> <u>Washington State Subclass</u>: All telephone customers within the State of Washington who received a call on their telephone with a prerecorded message, initiated by or on behalf of Defendant and marketing Defendant's products and services, and made using an automatic dialing and announcing device for purposes of commercial solicitation, at any time for the period that begins 4 years from the date of this complaint to trial.

<u>Id.</u> at p. 5, ¶ 7.1. In addition to the relief noted above, plaintiff seeks certification of the above proposed classes and appointment of both himself and his counsel as representative and counsel for those classes. <u>See</u> <u>id.</u> at pp. 10-11.

On March 28, 2014, defendant filed a motion for summary judgment seeking to dismiss plaintiff's TCPA, WADAD and WCPA claims. <u>See</u> ECF #28. On July 1, 2014, the Court granted defendant's motion as to those calls made by OneCommand on behalf of defendant beginning in 2011, with respect to the TCPA claim (<u>see</u> ECF #50). On July 18, 2014, plaintiff filed his motion

ORDER - 7

for class certification. See ECF #55. Plaintiff's motion for reconsideration of the Court's order

granting in part defendant's motion for summary judgment was denied on October 3, 2014. See

ECF #73. Accordingly, that portion of plaintiff's TCPA claim regarding the calls OneCommand

made on defendant's behalf beginning in 2011, is no longer before the Court, and therefore is not

entitled to class certification.

DISCUSSION

I.      The TCPA

The Telephone Consumer Protection Act provides in relevant part:

It shall be unlawful for any person within the United States, or any person
outside the United States if the recipient is within the United States--

(A) to make any call (other than a call made for emergency purposes or made
with the prior express consent of the called party) using any automatic
telephone dialing system or an artificial or prerecorded voice--

. . .

(iii) to any telephone number assigned to a paging service, cellular telephone
service, specialized mobile radio service, or other radio common carrier
service, or any service for which the called party is charged for the call;

47 U.S.C. § 227(b)(1)(A)(iii). "The term 'automatic telephone dialing system' means equipment

which has the capacity . . . to store or produce telephone numbers to be called, using a random or

sequential number generator," and "to dial such numbers." 47 U.S.C. § 227(a)(1). The TCPA

thus makes it unlawful to call a telephone number assigned to cellular service using an automatic

telephone dialing system or a prerecorded voice. See Grant v. Capital Mgmt. Serv., Inc., 449

Fed. Appx. 598, 600 (9th Cir. 2011); Satterfield v. Simon & Schuster, Inc., 569 F.3d 946, 952

(9th Cir. 2009).

"The TCPA provides a private right of action for claims of calls made in violation of

ORDER - 8

[that] Act." <u>Smith v. Microsoft Corp.</u>, 2012 WL 2975712, *4 (S.D. Cal. July 20, 2012) (citing 47

U.S.C. § 227(b)(3)). Exempted from the TCPA's prohibition on automated or prerecorded calls

are those "made with the prior consent of the called party." <u>Satterfield</u>, 569 F.3d at 955 (quoting

47 U.S.C. § 227(b)(1)(A)). "[T]he TCPA does not define "prior express consent," but the Ninth

Circuit has held "express consent" to mean "[c]onsent that is clearly and unmistakably stated."

<u>Id.</u> (quoting Black's Law Dictionary 323 (8th ed. 2004)); <u>Kolinek v. Walgreen Co.</u>, 2014 WL

3056813, *2 (N.D. Ill. July 7, 2014). "[E]xpress consent" has been found to exist where an

individual "voluntarily provides" his or her telephone number "to another." <u>Pinkard v. Wal-Mart</u>

<u>Stores, Inc.</u>, 2012 WL 5511039, at *6 (N.D. Ala. 2009) (citing <u>In re Rules and Regulations</u>

<u>Implementing the Telephone Consumer Protection Act of 1991</u>, 7 FCC Rcd. 8752, 8769, ¶ 31

(Oct. 16, 1992)  ("[P]ersons who knowingly release their phone numbers have in effect given

their invitations or permission to be called at the number which they have given, absent

instructions to the contrary.").

　　　　"'[E]xpress consent' is not an element of a TCPA plaintiff's prima facie case, but rather

is an affirmative defense for which the defendant bears the burden of proof." <u>Grant</u>, 449 F.ed.

Appx. at 600 n. 1; <u>see also</u> <u>Levy v. Receivables Performance Mgmt., LLC</u>, 972 F.Supp.2d 409,

417 (E.D.N.Y. 2013). Further, it is generally "the party on whose behalf" the call was made that

"bears the ultimate responsibility for any [TCPA] violations." <u>In re Rules and Regulations</u>

<u>Implementing the Telephone Consumer Protection Act of 1991</u>, 10 FCC Rcd. 12391, 12393, ¶

13 (Aug. 7, 1995); <u>see also</u> <u>In re Rules and Regulations Implementing the Telephone Consumer</u>

<u>Protection Act of 1991</u>, 20 FCC Rcd. 13664, 13667, ¶ 7 (Aug. 17, 2005) (calls placed by third

party on behalf of company for whom those calls were made are treated as if that company itself

had placed them).

ORDER - 9

II.   WADAD and the WCPA

The WADAD statute reads in relevant part:

(1) As used in this section:

(a) An automatic dialing and announcing device [("ADAD")] is a device which automatically dials telephone numbers and plays a recorded message once a connection is made.

(b) Commercial solicitation means the unsolicited initiation of a telephone conversation for the purpose of encouraging a person to purchase property, goods, or services.

(2) No person may use an automatic dialing and announcing device for purposes of commercial solicitation. This section applies to all commercial solicitation intended to be received by telephone customers within the state.

(3) A violation of this section is a violation of chapter 19.86 RCW. It shall be presumed that damages to the recipient of commercial solicitations made using an automatic dialing and announcing device are five hundred dollars.

RCW 80.36.400. WADAD thus "flatly prohibits the use of ADADs in commercial solicitation" (Hovila v. Tween Brands, Inc., 2010 WL 1433417, *12 (W.D. Wash. April 7, 2010)), and makes a violation of RCW 80.36.400 a violation of the WCPA.

As the undersigned previously held in regard to the use of the term "solicitation" in WADAD, "[t]he common, ordinary meaning of the word 'unsolicited'" applies, which means "'not asked for' or 'not requested.'" ECF #50, p. 10 (quoting Hovila, 2010 WL 1433417 at *12). Further, as also previously held by other judges of this Court, "an unsolicited message placed by an automatic dialing and announcing device which asks the recipient to return the call initiates a telephone conversation and therefore falls within the definition of 'commercial solicitation," whereas "a message that does not initiate a conversation does not violate the WADAD." Hartman v. United Bank Card, Inc., 2012 WL 4758052, at *9 ("Hartman I") (citing Anderson v. Domino's Pizza, Inc., 2012 WL 1684620, at *3 (W.D. Wash. May 15, 2012); Meillieur v. AT &

ORDER - 10

1  T, Inc., 2011 WL 5592647, at *7 (W.D. Wash. Nov.16, 2011); Cubbage v. Talbots, Inc., 2010

2  WL 2710628, at *5 (W.D. Wash. July 7, 2010)).

3  III.     Federal Rule of Civil Procedure 23

4       "The class action is 'an exception to the usual rule that litigation is conducted by and on

5  behalf of the individual named parties only.'" Wal-Mart Stores, Inc. v. Dukes, 131 S.Ct. 2541,

6  2550 (2011) (quoting Califano v. Yamasaki, 442 U.S. 682, 700-01 (1979)). To justify departing

7  from that rule, "a class representative must be part of the class and 'possess the same interest and

8  suffer the same injury' as the class members." Id. (quoting East Tex. Motor Freight Sys., Inc. v.

9

10  Rodriguez, 431 U.S. 395, 403 (1977) (quoting Schlesinger v. Reservists Comm. to Stop the War,

11  418 U.S. 208, 216 (1974)). The class certification determination "requires a two-step analysis"

12  under Fed. R. Civ. P. 23. Whitten v. ARS Nat'l Serv., Inc., 2001 WL 1143238, at *2 (N.D. Ill.,

13  Sept. 27, 2001). First, "[c]ertification is only appropriate" where the following prerequisites are

14  satisfied:

15

16       (1)  the class is so numerous that joinder of all members is impracticable;

17       (2)  there are questions of law or fact common to the class;

18       (3)  the claims or defenses of the representative parties are typical of the
           claims or defenses of the class; and

19

20       (4)  the representative parties will fairly and adequately protect the interests
           of the class.

21

22  Lee v. Stonebridge Life Ins. Co., 289 F.R.D. 292, 293-94 (N.D. Cal. 2013); Fed. R. Civ. P. 23(a);

23  see also Parra v. Bashas', Inc., 536 F.3d 975, 978 (9th Cir. 2008); Celano v. Marriott Int'l Inc.,

24  242 F.R.D. 544, 548 (N.D. Cal. 2007) ("As a threshold to class certification, plaintiffs must

25  satisfy [the] four prerequisites under Rule 23(a)."). This "effectively 'limit[s] the class claims to

26  those fairly encompassed by the named plaintiff's claims.'" Dukes, 131 S.Ct. at 2550 (quoting

ORDER - 11

1   General Telephone Co. of Southwest v. Falcon, 457 U.S. 147, 156 (1982)). Thus, "[f]ailure to

2   satisfy even one" of the above four requirements "precludes class certification." CE Design v.

3   Beaty Constr., Inc., 2009 WL 192481, *1 (N.D. Ill., Jan. 26, 2009) (citing Harrison v. Chicago

4   Tribune Co., 992 F.2d 697, 703 (7th Cir. 1993)).

5       Second, in addition to satisfying "all four of the Rule 23(a) requirements," a class action

6   "must qualify under one of the three subsections of Rule 23(b)." Heastie v. Community Bank of

7   Greater Peoria, 125 F.R.D. 669, 673 (N.D.Ill. 1989); see also Parra, 536 F.3d at 978, n. 1. Under

8
9   Fed. Civ. P. 23(b), it must be demonstrated:

10          . . . (1) that the prosecution of individual actions would create a risk of
            inconsistent verdicts that would establish incompatible standards of conduct
11          for defendant or would be dispositive of the claims of the non-party class
            members or substantially impede the ability of non-party class members to
12          pursue their own claims; (2) that the defendant acted or refused to act on
            grounds generally applicable to the class, so that declaratory or injunctive
13          relief is appropriate with respect to the entire class; or (3) that common
            questions of law or fact predominate and that a class action is superior to other
14          available methods of adjudication. . . .

15
16   In re Rubber Chemicals Antitrust Litig., 232 F.R.D. 346, 349-50 (N.D. Cal. 2005); see also

17   Holloway v. Full Spectrum Lending, 2007 WL 7698843, at *2 (C.D. Cal. June 26, 2007).

18       "The party seeking class certification has the burden of affirmatively demonstrating that

19   the class meets the requirements of" Fed. R. Civ. P. 23. Mazza v. American Honda Motor Co.,

20   Inc., 666 F.3d 581, 588 (9th Cir. 2012) (citing Dukes, 131 S.Ct. at 2551 ("A party seeking class

21   certification must affirmatively demonstrate his compliance with the Rule – that is, he must be

22
23   prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law

24   or fact, etc.") (emphasis in original)); see also Zinser v. Accufix Research Institute, Inc., 253

25   F.3d 1180, 1186 (9th Cir. 2001) ("[T]he party seeking class certification . . . bears the burden of

26   demonstrating that she has met each of the four requirements of Rule 23(a) and at least one of the

ORDER - 12

requirements of Rule 23(b).").

"Before certifying a class, the trial court must conduct a 'rigorous analysis' to determine whether the party seeking certification has met the prerequisites of Rule 23." Zinser, 253 F.3d at 1186  (quoting Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1233 (9th Cir. 1996); see also Dukes, 131 S.Ct. at 2551 ("[C]ertification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.") (citing Falcon, 457 U.S. at 160 ("actual, not presumed, conformance with Rule 23(a) remains . . . indispensable")). "[D]oubts regarding the propriety of class certification should be resolved in favor of certification." Gonzales v. Arrow Financial Serv. LLC, 489 F.Supp.2d 1140, 1154 (S.D. Cal. 2007) (quoting Slaven v. BP America, Inc., 190 F.R.D. 649, 651 (C.D. Cal. 2000) (quoting Groover v. Michelin North Am., Inc., 187 F.R.D. 662, 670 (M.D. Ala. 1999) (citing 4 H. Newberg & A. Conte, Newberg on Class Actions § 7540 (3d ed.1992))). But "if a court is not fully satisfied that the requirements of Rules 23(a) and (b) have been met, certification should be refused." In re Ferrero Litig., 278 F.R.D. 552, 557 (S.D. Cal. 2011) (citing Falcon, 457 U.S. at 161).

"The decision to grant or deny class certification is within the trial court's discretion." Bateman v. American Multi-Cinema, Inc., 623 F.3d 708, 712 (9th Cir. 2010) (noting district court is "in the best position to consider the most fair and efficient procedure for conducting any given litigation") (citation omitted). While that discretion is "broad", it still "must be exercised within the framework of Rule 23." Zinser, 253 F.3d at 1186. In determining whether the requirements of that rule have been satisfied, "a court may not inquire into whether the plaintiff will prevail on the merits of the case," but instead "must accept the substantive allegations in the complaint as true." Holloway, 2007 WL 7698843 at *2 (C.D. Cal. June 26, 2007) (citing Eisen v.

ORDER - 13

1    Carlisle & Jacquelin, 417 U.S. 156, 177-78 (1974); In re Coordinated Pretrial Proceedings in

2    Petroleum Prods. Antitrust Litig., 691 F.2d 1335, 1342 (9th Cir. 1982)); see also Moore v.

3    Hughes Helicopters, Inc., 708 F.2d 475, 480 (9th Cir. 1983) (improper to advance decision on

4    merits at class certification stage ); Celano, 242 F.R.D. at 548.

5           "Sometimes the issues are plain enough from the pleadings to determine whether the

6    interests of the absent parties are fairly encompassed within the named plaintiff's claim." Falcon,

7    457 U.S. at 160. However, it also "may be necessary for the court to probe behind the pleadings

8    before coming to rest on the certification question." Id. This is because "the class determination

9    generally involves considerations that are 'enmeshed in the factual and legal issues comprising

10   the plaintiff's cause of action.'" Id. (quoting Coopers & Lybrand v. Livesay, 437 U.S. 463, 469

11   (1978) (quoting Mercantile Nat. Bank v. Langdeau, 371 U.S. 555, 558 (1963)); see also Dukes,

12   131 S.Ct. at 2551 ("Frequently [the district court's] 'rigorous analysis' will entail some overlap

13   with the merits of the plaintiff's underlying claim.").

14          The plaintiff's causes of action, therefore, will be scrutinized "to determine whether they

15   are suitable for resolution on a class wide basis." Celano, 242 F.R.D. at 548 (citing Moore, 708

16

17   F.2d at 480); see also Ellis v. Costco Wholesale Corp., 657 F.3d 970, 981 (9th Cir. 2011) (court

18   "*must* consider the merits if they overlap with Rule 32(a) requirements") (emphasis in original).

19   To that end, the district court "should make whatever factual and legal inquiries are necessary

20   under Rule 23." Szabo v. Bridgeport Machines, Inc., 249 F.3d 672, 675-76 (7th Cir. 2001); see

21   also Rubber Chemicals, 232 F.R.D. at 350 (court may consider extrinsic evidence submitted by

22

23   parties) (citing Blackie v. Barrack, 524 F.2d 891, 901 (9th Cir. 1975)). But "an ultimate

24   adjudication on the merits of" a plaintiff's claims remains "inappropriate, and any inquiry into

25

26   the merits must be strictly limited to evaluating [the plaintiff's] allegations to determine whether

ORDER - 14

they satisfy Rule 23." Lee, 289 F.R.D. at 294 (citing Ellis, 657 F.3d at 983 n. 8); see also

Knutson v. Schwan's Home Service, Inc., 2013 WL 4774763, *3 (S.D. Cal. Sept. 5, 2013)

("court should not conduct a mini-trial to determine if the class 'could actually prevail on the

merits of their claims'") (quoting Ellis, 657 F.3d at 983 n. 8); Ferrero, 278 F.R.D. at 557 (review

of merits "should be limited to those aspects relevant to making the certification decision on an

informed basis") (citing Fed. R. Civ. P. 23 advisory committee notes).

     A.    Numerosity

     "The prerequisite of numerosity is discharged if 'the class is so large that joinder of all

members is impracticable.'" Hanlon v. Chrysle Corp., 150 F.3d 1011, 1019 (9th Cir. 1998)

(quoting Fed. R. Civ. P. 23(a)(1)). "'Impracticability does not mean impossibility,' rather the

inquiry focuses on the difficulty or inconvenience of joining all members of the class." Ferrero,

278 F.R.D. at 557 (quoting Harris v. Palm Springs Alpine Estates, Inc., 329 F.2d 909, 913-14

(9th Cir. 1964)). A plaintiff need not "state the exact number of potential class members, nor is a

specific number of class members required." Rubber Chemicals, 232 F.R.D. at 351; see also

Tchoboian v. Parking Concepts, Inc., 2009 WL 2169883, at *4 (C.D. Cal. July 16, 2009) ("The

fact that the size of the proposed class has not been exactly determined is not a fatal defect . . . ; a

class action may proceed upon estimates as to the size of the proposed class.") (quoting In re

Alcoholic Beverages Litig., 95 F.R.D. 321, 324 (D.C.N.Y. 1982)). Further, "[a] court may make

common sense assumptions to support a finding that joinder would be impracticable." Rubber

Chemicals, 232 F.R.D. at 351 (citing 1 Robert Newberg, Newberg on Class Actions, § 3:3 (4th

ed. 2002) ("Where the exact size of the class is unknown but general knowledge and common

sense indicate that it is large, the numerosity requirement is satisfied.").

     "Although there is no 'bright line' test for numerosity," classes comprising less than 100

ORDER - 15

and as few as 40 members have been found to be "generally sufficient." <u>McCabe v. Crawford & Co.</u>, 210 F.R.D. 631, 643 (N.D. Ill. 2002); <u>Cole v. Asurion Corp.</u>, 267 F.R.D. 322, 326 (C.D. Cal. 2010); <u>see also</u> <u>G.M. Sign, Inc. v. Finish Thompson, Inc.</u>, 2009 WL 2581324, at *3 (N.D. Ill. Aug. 20, 2009); <u>Holloway</u>, 2007 WL 7698843, at *3; <u>Celano</u>, 242 F.R.D. at 549. Thus, not surprisingly, "joinder of potentially thousands of plaintiffs – or even hundreds of them – would be impracticable." <u>CE Design, Ltd v. Cy's Crabhouse North, Inc.</u>, 259 F.R.D.135, 140 (N.D. Ill. 2009); <u>see also</u> <u>Rubber Chemicals</u>, 232 F.R.D. at 350 n. 2 ("[I]t has been suggested that a class exceeding one hundred members would satisfy the numerosity requirement.").

Plaintiff's counsel states defendant's counsel "stipulated on the record" that defendant "would concede to numerosity under Rule 23(a)(1) as to the number of 'welcome' calls made in December 2009 for purposes of [the] class certification motion." ECF #56, p. 3, ¶ 9. Defendant does not contest the veracity of this statement. The Court thus finds the numerosity requirement is satisfied as to the December 2009 "welcome" calls in regard to both of the asserted classes. Plaintiff also has provided a document from OneCommand that plaintiff's counsel states shows OneCommand called a total of 8,143 telephone numbers – all of which have Washington state area codes – on defendant's behalf. <u>See</u> ECF #56, p. 2, ¶ 7, Exhibit 6. According to plaintiff's counsel, OneCommnad "has represented that all 8,143 telephone numbers are cellular telephone numbers." ECF #56, p. 2, ¶ 7.

Although it is unclear from the record before the court what time period those calls cover (<u>see</u> ECF #56, p. 2, ¶ 7, Exhibit 6), defendant does not challenge plaintiff's counsel's statement that they appear to cover both the December 2009 "welcome" message and those calls made beginning in early 2011 (<u>see</u> ECF #55, p. 14). In addition, even if not all of those numbers were called during the latter period, common sense dictates that a significant portion thereof likely

were. Accordingly, the Court also finds the numerosity requirement is met in regard to the calls

made beginning in early 2011 as to the Washington state subclass.

B.    Commonality

Commonality requires a showing that "there are questions of law or fact common to the

class." Dukes, 131 S.Ct. at 2550-51 (quoting Fed. R. Civ. P. 23(a)(2)). The plaintiff must

"demonstrate that the class members have 'suffered the same injury.'" Id. (quoting Falcon, 457

U.S. at 157). The plaintiff's claims thus "must depend upon a common contention," and that

contention "must be of such a nature that it is capable of classwide resolution – which means that

determination of its truth or falsity will resolve an issue that is central to the validity of each one

of the claims in one stroke." Id. Accordingly, "[w]hat matters to class certification . . . is not the

raising of common 'questions' – even in droves – but, rather the capacity of a classwide

proceeding to generate common *answers* apt to drive the resolution of the litigation." Id. (noting

further that "[d]issimilarities within the proposed class are what have the potential to impede

generation of common answers") (emphasis in original) (citation omitted).

Fed. R. Civ. P. 23(a)(2) is construed "permissively." Cole, 267 F.R.D. at 326 (citing

Hanlon, 150 F.3d at 1019). Indeed, while "merely alleging common questions" is not sufficient,

"the showing required" has been described as "'minimal' and 'not high.'" Ferrero, 278 F.R.D. at

558; Kavu v. Omnipak Corp., 246 F.R.D. 642, 647 (W.D. Wash. 2007) (citing Hanlon, 150 F.3d

at 1020); Mortimore v. F.D.I.C., 197 F.R.D. 432, 436 (W.D. Wash. 2000)). "All questions of fact

and law need not be common to satisfy the rule." Hanlon, 150 F.3d at 1019. "The existence of

shared legal issues with divergent factual predicates is sufficient, as is a common core of salient

facts coupled with disparate legal remedies within the class." Id.; see also G.M. Sign, 2009 WL

2581324, at *5 ("Factual variations amongst class members' claims . . . do not necessarily defeat

ORDER - 17

class certification as long as the representatives claims are based on the same course of conduct and legal theory as the class as a whole.") (citing De LaFuente v. Stokely-Van Camp, Inc., 713 F.2d 225, 232 (7th Cir. 1983)). Further, "[t]he named [p]laintiff need only share at least one question of fact or law with the prospective class." Ferrero, 278 F.R.D. at 558 (citing Rodriguez v. Hayes, 591 F.3d 1105, 1122 (9th Cir. 2010)); see also Mazza, 666 F.3d at 589 (commonality "only requires a single significant question of law or fact").

"A defendant's pattern of standardized conduct generally is sufficient to constitute a common nucleus of operative facts." Cy's Crabhouse, 259 F.R.D. at 141 (citing Keele v. Wexler, 149 F.3d 589, 594 (7th Cir. 1992)). "[T]he alleged existence of a common practice" by a defendant may be sufficient, even though the defendant's actions do "not affect each member of the class in the same way." Ashimus v. Calderon, 935 F.Supp. 1048, 1065 (N.D. Cal. 1996). The Court finds the commonality requirement is met as to the December 2009 "welcome" message with respect to both the national class and Washington state subclass. This is because plaintiff's "allegation is not merely that all class members suffered a violation of the TCPA" or WADAD or WCPA, but that members of both classes were sent the same unsolicited prerecorded telephone message by defendant through OneCommand's automated call program. Agne v. Papa John's Int'l, Inc., 286 F.R.D. 559, 567 (W.D. Wash. 2012).

Defendant does not specifically address the issue of commonality – or that of typicality discussed below – but instead argues that because plaintiff voluntarily gave his cellular telephone number to old Tacoma Dodge, as did old Tacoma Dodge's other customers, his TCPA claim is subject to the same flaw the Court previously found in regard to his TCPA claim based on the calls made in 2011 and 2012. That is, because the 2009 "welcome" message is closely related to the circumstances under which plaintiff provided his cellular telephone number to old Tacoma

ORDER - 18

Dodge, he gave his prior express consent to be called on that phone by defendant. Defendant also argues plaintiff cannot prevail on his WADAD or WPCA claims, because the 2009 "welcome" message did not invite a return call or otherwise initiate a conversation, and thus is not commercial solicitation. These arguments, though, go to the actual merits of plaintiff's claims, rather than to the issue of whether it is proper to certify the suggested classes, an inquiry that is not appropriate at this stage of the proceedings as noted above. See id. ("district court should judge the persuasiveness of the evidence of commonality put forward by plaintiff but not determine whether class members can prevail on the merits of their claims") (citing Ellis, 657 F.3d at 982-83 and n. 8).[4]

In other words, whether plaintiff's claims ultimately are "meritorious is a question to be resolved later." Id. at 568. Here, the issue is whether the evidence plaintiff has provided suggests defendant's involvement in sending the 2009 "welcome" message "is a common question of liability that can be resolved 'in one stroke' and 'is central to the validity of'" the claims against it. Id. Given that it is undisputed that defendant through OneCommand sent the same "welcome" message to the cellular telephone numbers it obtained from old Tacome Dodge through the 2009 asset purchase and sale agreement, and that it was old Tacome Dodge's practice to obtain those numbers as a means of contacting its customers, the Court finds there are issues common to both classes in regard to the December 2009 "welcome" calls, and thus the commonality requirement has been satisfied with respect thereto. See Kavu, 246 F.R.D. at 647 (commonality requirement satisfied where class membership could be determined "based on objective criteria" rather than requiring "an inquiry into the merits" for each prospective class member).

---

[4] See also Blackie, 524 F.2d at 901 ("[N]either the possibility that a plaintiff will be unable to prove his allegations, nor the possibility that the later course of the suit might unforeseeably prove the original decision to certify the class wrong, is a basis for declining to certify a class which apparently satisfies the Rule.").

1   That being said, the Court finds the commonality requirement has not been met in regard

2   to the Washington state subclass and the WADAD and WCPA claims concerning the calls made

3   beginning in early 2011. As noted above, plaintiff received one service thank you call and a total

4   of four additional service reminder calls in 2011 and 2012. It is not at all clear, however, that any

5   of these calls constitute "commercial solicitation" under WADAD based on the list of automated

6   messages provided by OneCommand. See ECF #56, Exhibits 7-8. But more importantly – since

7   that question arguably could be determined objectively on a classwide basis – is the fact that it is

8   not at all clear what message the other putative class members received, whether they were the

9   same ones that plaintiff received and if they were different, whether they constitute "commercial

10   solicitations" under WADAD. As such, an individualized inquiry into the merits to determine if

11   the other customers called by defendant are members of the Washington state subclass would be

12   required, and therefore commonality has not been established here. See id.

13       C.       Typicality

14   "Rule 23(a)(3) provides that 'the claims or defenses of the representative parties [must

15   be] typical of the claims or defenses of the class.'" Agne, 286 F.R.D. at 568 (quoting Fed. R.

16   Civ. P. 23(a)(3)). "The test of typicality is whether other members have the same or similar

17   injury, whether the action is based on conduct which is not unique to the named plaintiffs, and

18   whether other class members have been injured by the same course of conduct." Id. (quoting

19   Ellis, 657 F.3d at 984). "[R]epresentative claims are 'typical' if they are reasonably co-extensive

20   with those of absent class members; they need not be substantially identical." Hanlon, 150 F.3d

21   at 1020. Typicality "serves to ensure that 'the interest of the named representative aligns with the

ORDER - 20

interests of the class.'"[5] <u>Agne</u>, 286 F.R.D. at 568 (quoting <u>Wolin v. Jaguar Land Rover N. Am.,</u> <u>LLC</u>, 617 F.3d 1168, 1172 (9th Cir. 2010)). Typicality is "satisfied when each class member's claims arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." <u>Zeisel v. Diamond Foods, Inc.</u>, 2011 WL 2221113, at *7 (N.D. Cal. June 7, 2011) (quoting <u>Armstrong v. Davis</u>, 275 F.3d 849, 868 (9th Cir. 2001) (citation omitted)).

"When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually satisfied, irrespective of varying fact patterns which underlie individual claims." <u>Kavu</u>, 246 F.R.D. at 648 (quoting <u>Smith v. Univ. of Wash. Law Sch.</u>, 2 F.Supp.2d 1324, 1342 (E.D. Wash. 1998)); <u>see also</u> <u>G.M. Sign</u>, 2009 WL 2581324, at *5 ("[F]actual differences may be excused as long as the named representative's claims are based on the same course of conduct as the class as a whole and the same legal theory.") (quoting <u>De la Fuenta</u>, 713 F.2d at 232). Certification is not appropriate, however, "where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." <u>Ferrero</u>, 278 F.R.D. at 558; <u>see also</u> <u>G.M. Sign</u>, 2009 WL 2581324, at *5 (typicality "should be determined with reference to [the defendant's] actions, not with respect to particularized defenses it might have against certain class members") (quoting <u>Wagner v. NutraSweet Co.</u>, 95 F.3d 527, 534 (7th Cir. 1996)).

"[A] finding of commonality will ordinarily support a finding of typicality." <u>Ashmus v.</u> <u>Calderon</u>, 935 F.Supp. 1048, 1066 (N.D. Cal. 1996) (citing <u>Falcon</u>, 457 U.S. at 157 n. 13). "As with the commonality requirement, the typicality requirement is applied permissively." <u>Zeisel</u>,

---

[5] "The commonality and typicality requirements of Rule 23(a) tend to merge." <u>Falcon</u>, 457 U.S. at 157 n. 13. "Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." <u>Id</u>.

2011 WL 2221113, at *7 (citing <u>Hanlon</u>, 150 F.3d at 1020). As discussed above, in December

2009, defendant sent via OneCommand the same prerecorded "welcome" message to the former

customers of old Tacoma Dodge. As such, in regard to the TCPA, WADAD and WCPA claims

based on that message, the putative national class and Washington state subclass members were

subject to the same allegedly unlawful conduct by defendant, and there do not appear to be any

defenses unique to plaintiff that would make class certification inappropriate. Indeed, defendant

does not specifically challenge typicality here.

For the same reasons set forth above, however, the Court finds typicality has not been

established as to the calls beginning in early 2011 in regard to the WADAD and WCPA claims

and the Washington state subclass. Again, because it is not at all clear which customers received

which prerecorded messages with those calls – and to the extent prerecorded messages were

received, which messages constitute commercial solicitation – making the determination as to

which of the putative class members should be made part of the subclass will necessarily require

"individualized evidence and analysis." <u>Hartman I</u>, 2012 WL 4758052, at *13; <u>see also</u> <u>Kavu</u>,

246 F.R.D. at 647 (class definition did not require individualized "inquiry into the merits," but

rather could be determined "based on objective criteria").

  D.  <u>Adequacy of Representation</u>

"Rule 23(a)(4) requires that the representative parties will fairly and adequately protect

the interests of the class." <u>Rubber Chemicals</u>, 232 F.R.D. at 351. "Representation is adequate if:

(1) the class representative and counsel do not have any conflicts of interest with other class

members; and (2) the representative plaintiff and counsel will prosecute the action vigorously on

behalf of the class." <u>Ubaldi v. SLM Corp.</u>, 2014 WL 1266783, at *9 (N.D. Cal. Mar. 24, 2014)

(citing <u>Staton v. Boeing</u>, 327 F.3d 938, 957 (9th cir. 2003)). "To satisfy this requirement, the

ORDER - 22

interests of the representative parties must coincide with those of the rest of the class, and class counsel must be prepared and able to prosecute the action effectively." <u>Cy's Crabhouse</u>, 259 F.R.D. at 141-42. "Conflicts of interest may arise when one group within the larger class possesses a claim that is neither typical of the rest of the class nor shared by the class representative." <u>Hesse v. Sprint Corp.</u>, 598 F.3d 581, 589 (9th Cir. 2010).

"A class member is generally considered adequate if," in addition to a lack of conflicting or "antagonistic" claims, he or she "has a sufficient interest in the outcome to ensure vigorous advocacy." <u>Whitten v. ARS Nat'l Serv., Inc.</u>, 2001 WL 1143238, at *4 (N.D. Ill. Sept. 27, 2001) ("The court should assure itself that plaintiff has '*some* commitment to the case, so that the 'representative' . . . is not a fictive concept.") (quoting <u>Rand v. Monsanto Co.</u>, 926 F.2d 596, 599 (7th Cir. 1991)) (emphasis in original). The "zeal, competence, and experience" of the plaintiff's counsel "'are factors relevant to the District Court's exercise of discretion' in the appointment of counsel." <u>Ashmus</u>, 935 F.Supp. at 1066 (citation omitted).

The Court finds the adequacy of representation requirement has been met here. There do not appear to be any conflicts of interest between plaintiff or his counsel and the other putative class members. There also is no indication that plaintiff lacks sufficient interest in the outcome of this case or that he will not prosecute this action vigorously. Further, based on the prosecution of this action to date and the representations made by plaintiff's counsel, they appear to possess the zeal, competence and experience required. <u>See</u> ECF #57. Indeed, defendant does not contest the adequacy of either plaintiff or plaintiff's counsel in this matter.

E.      <u>Rule 23 (b)(3)</u>

Plaintiff asserts class certification is appropriate under Fed. R. Civ. P. 23(b)(3). Pursuant to that rule, certification is appropriate when "questions of law or fact common to class members

ORDER - 23

predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Id. The purpose of both the "predominance" and the "superiority" requirements is "to cover cases 'in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" Amchem Products, Inc. v. Windsor, 521 U.S. 591, 615 (1997) (quoting Adv. Comm. Notes, 28 U.S.C.App., p. 697).

1.   Predominance

"The predominance inquiry requires a court to consider 'how a trial on the merits would be conducted if a class were certified." Gene and Gene LLC v. Biopay, LLC, 541 F.3d 318, 326 (5th Cir. 2008) (citation omitted). "This, in turn, 'entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class, a process that ultimately prevents the class from degenerating into a series of individual trials." Id. "The predominance requirement of Rule 23(b)(3), though redolent of the commonality requirement of Rule 23(a), is 'far more demanding' because it 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" Id. (quoting Amchem, 521 U.S. at 623-24); see also Hanlon, 150 F.3d at 1022 ("Rule 23(b)(3) predominance . . . analysis presumes that the existence of common issues of fact or law have been established pursuant to Rule 23(a)(2)."); Wolin, 617 F.3d at 1172 ("While Rule 23(a)(2) asks whether there are issues common to the class, Rule 23(b)(3) asks whether these common questions predominate.").

To satisfy the predominance requirement, it must be established that "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . .

ORDER - 24

predominate over those issues that are subject only to individualized proof." <u>Frickco Inc. v. Novi BRS Enterprises, Inc.</u>, 2011 WL 2079704, at *2 (E.D. Mich. May 25, 2011) (quoting <u>Beattie v. CenturyTel, Inc.</u>, 511 F.3d 554, 564 (9th Cir. 2007)); <u>see also</u> <u>Zeisel</u>, 2011 WL 2221113, at *9 ("[T]he Court must determine whether plaintiffs have shown that there are plausible classwide methods of proof available to prove their claims.") (citation omitted); <u>Rubber Chemicals</u>, 232 F.R.D. at 352 (plaintiff must establish "common or generalized proof will predominate at trial" as to essential elements of his or her claim) (citation omitted). Thus, where "the main issues in a case require the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3) action would be inappropriate." <u>Zinser</u>, 253 F.3d at 1189 (quoting 7A Charles Alan Wright, Arther R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1778 at 535-39 (2d ed. 1986) (footnotes omitted)).

"Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy." <u>Zinser</u>, 253 F.3d at 1189 (citation omitted) ("[W]hen individual rather than common issues predominate, the economy and efficiency of class action treatment are lost and the need for judicial supervision and the risk of confusion are magnified.") (quoting 7A Wright, Miller & Kane, Federal Practice and Procedure § 1778 at 535-39 (footnotes omitted)). Fed. R. Civ. P. 23(b)(3) "requires convincing proof that the common questions 'predominate.'" <u>Olney v. Job.com, Inc.</u>, 2013 WL 5476813, at *15 (E.D. Cal. Sept. 30, 2013) (quoting <u>Amchem</u>, 521 U.S. at 623-24). Thus, "[w]hen common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is a clear justification for handling the dispute on a representative rather than on an individual basis." <u>Hanlon</u>, 150 F.3d at 1022 (quoting Wright, Miller & Kane, Federal Practice and Procedure § 1778).

ORDER - 25

As with the commonality and typicality requirements of Fed. R. Civ. P. 23(a), the district court "decides neither the merits of the parties' claims or defenses nor 'whether the plaintiffs are likely to prevail on their claims'" in determining "whether common issues predominate." Zeisel, 2011 WL 2221113, at *9 (quoting Negrete v. Allianz Life Ins., Co., 238 F.R.D. 482, 489 (C.D. Cal. 2006). To determine whether such issues predominate, "the elements of each" claim must be analyzed. Id. (citing Keilholtz v. Lennox Hearth Products Inc., 268 F.R.D. 330, 342 (N.D. Cal. 2010); see also Erica P. John Fund, Inc. v. Halliburton Co., 131 S.Ct. 2179, 2184 (2011) ("Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action.") (quoting Matrix Initiatives, Inc. v. Siracusano, 131 SCt. 1309, 1317 (2011)).

The Court finds plaintiff has satisfied the predominance requirement with respect to his TCPA claim concerning the December 2009 "welcome" message, given that the predominant issue of prior express consent is subject to generalized proof on a classwide basis. As discussed previously, the cellular telephone numbers to which the message was sent all came from old Tacoma Dodge, which obtained them as part of its regular practice of obtaining customer information, and each cellular number received the same "welcome" message. Defendant likely is correct that "the issue of consent will entirely determine how the proposed class-action trial will be conducted on the merits" Gene and Gene, 541 F.3d at 327. Defendant's reliance on Gene and Gene, however, does not help it in this case.

In Gene and Gene, the Fifth Circuit indicated that in a TCPA case "the question of consent" may be "susceptible to common proof" without the need for "individual evidence," where the defendant obtains "all of the . . . numbers from a single purveyor of such information," and the plaintiff can "propose a . . . class-wide means of establishing the lack of consent." Id. at

ORDER - 26

327-28; see also Connelly v. Hilton Grand Vacations Co., LLC, 294 F.R.D. 574, 577 (S.D. Cal. 2013). The Fifth Circuit contrasted that situation with the entirely different situation in Gene and Gene, where the defendant had obtained the "numbers from a variety of sources over a period of time, such that class-wide proof of consent is not possible." Id. at 328-29.

The case at hand, however, more closely resembles that of the single purveyor situation. All of the cellular telephone numbers came from one source, old Tacoma Dodge, which the evidence currently before the Court indicates were obtained during the course of transactions with its customers so that old Tacoma Dodge could contact those customers. As such, this is not a situation where the predominant issue and its resolution is "critical to the determination" of the defendant's liability "with respect to each call" thereby leading "to the conclusion that myriad mini-trials cannot be avoided," but rather "may be resolved on a classwide basis." Id. at 329; Hartman I, 2012 WL 4758052, at *15.

While the numbers defendant acquired from old Tacoma Dodge likely were obtained over some period of time, it is not at all clear this makes any real difference in regard to the issue of class certification. See Ubaldi, 2014 WL 1266783, at *10 ("Claims need not be identical for common issues of law and fact to predominate, they need only be reasonably coextensive with those of absent class members.") (citing Hanlon, 150 F.3d at 1020). In addition, given that the same "welcome" message was sent to each cellular telephone number, the issue of commercial solicitation likely at the heart of plaintiff's WADAD and WCPA claims also can be said to be subject to generalized proof, rather than individualized inquiries. Accordingly, the Court finds those claims satisfy the predominance requirement as well.

With respect to the calls made on behalf of defendant by OneCommand beginning in early 2011, however, plaintiff's WADAD and WCPA claims fail the predominance test for the

ORDER - 27

same reasons they fail the commonality and typicality tests. Once more, because it is not at all clear which customers received which prerecorded messages and whether those prerecorded messages that were received constitute commercial solicitation, resolution of the commercial solicitation issue necessarily would require individualized evidentiary determinations as to each of the putative members of the Washington State subclass.

Relying on Hartman v. United Bank Card, Inc., 291 F.R.D. 591 (W.D. Wash. 2013) ("Hartman II"), defendant argues individualized determinations as to whether a recipient of a prerecorded message – including the December 2009 "welcome" message – was in Washington at the time the call was received would need to be made as well, and therefore this constitutes an additional reason for finding the predominance requirement has not been met. In the case before Judge James L. Robart in Hartman I and Hartman II, one defendant, United Bank Card, Inc. ("UBC") contracted with the second defendant, International Payment Systems, Inc. ("IPS"), both of which were located outside the State of Washington, to automatically dial telephone numbers with Washington area codes. See Hartman I, 2012 WL 4758052, at *1-*3. Further, the record indicated that neither defendant knew "where the person receiving the call would be located." Hartman II, 291 F.R.D. at 598.

In Hartman II, the plaintiffs argued that it did "not matter if the recipient of the call was actually located in Washington or elsewhere because all the [WADAD] statute requires is for the caller to *intend* to reach a customer in Washington." Id. (citing RCW 80.36.400(2) ("This section applies to all commercial solicitation intended to be received by telephone customers within the state.") (emphasis added)). Judge Robart rejected this statutory interpretation, because if it applied "irrespective of whether [the call recipient] was physically in Washington at the time of the call," that "would render WADAD unconstitutional under the dormant Commerce Clause

ORDER - 28

because it would mean that WADAD would apply to commerce wholly outside of Washington,"[6]

Id. Judge Robart went on to explain:

> . . . Plaintiffs urge the court to adopt an interpretation of the WADAD in which the words "within the state" modify the term "telephone customers" rather than the "commercial solicitation" that the statute addresses as a whole. Plaintiffs urge this interpretation upon the court in order to overcome the need for individualized hearings concerning whether each class plaintiff was located in Washington State at the time of the offending call. . . . This interpretation, however, is not compelled by the statutory language. . . . [A]n equally reasonable interpretation of WADAD is that the words "within the state" modify the prohibited commercial solicitation as a whole rather than just the term "telephone customers." *See* RCW 80.36.400(2) (stating in pertinent part that WADAD "applies to all commercial solicitation intended to be received by telephone customers within the state"). Here, the text of the statute in no way compels Plaintiffs' reading, and in fact the court must not adopt it in light of Washington's rule of statutory construction that requires that "[w]here possible, statutes should be construed to avoid unconstitutionality." *Wash. State Republican Party v. Wash. State Pub. Disclosure Comm'n*, 141 Wash.2d 245, 4 P.3d 808, 827 (2000); *see also In re Personal Restraint of Matteson*, 142 Wash.2d 298, 12 P.3d 585, 589 (2000) ("Whenever possible, it is the duty of this court to construe a statute so as to uphold its constitutionality.") (quoting *State v. Browet, Inc.*, 103 Wash.2d 215, 691 P.2d 571, 574 (1984)). Reading the WADAD as Plaintiffs propose would result in application of the statute to commercial solicitations using automatic dialing and announcing devices that were both initiated and received outside the State of Washington, and would render the statute unconstitutional by virtue of the dormant Commerce Clause. Accordingly, the court declines to adopt Plaintiffs' statutory construction. . . .

Id. at 599 (internal footnote omitted).

The Court, however, agrees with plaintiff that the facts of this case distinguishes it from

Hartman I and Hartman II, and therefore that the dormant Commerce Clause is not implicated.

---

[6] As Judge Robart noted:

> The Commerce Clause . . . has been interpreted as having a "negative" or "dormant" aspect that denies states the authority vested in Congress. . . . Under this clause, the Supreme Court has held that one state may not "project its legislation" into another state and that "a statute that directly controls commerce occurring wholly outside the boundaries of a state exceeds the inherent limits of the enacting State's authority." . . . A prohibited extraterritorial law is one in which the "practical effect of the regulation is to control conduct beyond the boundaries of the State." . . .

Id. (internal citations omitted).

ORDER - 29

As noted above, RCW 80.36.400(2) provides that "[n]o person may use an automatic dialing and announcing device for purposes of commercial solicitation." As plaintiff points out, the situation before Judge Robart involved UBC contracting with IPS to sell UBC's products and services on its behalf. See Hartman I, 2012 WL 4758052, at *1. IPS then hired a third party, ConnecTel, which was not a defendant, that offered a website platform through which IPS could send a prerecorded message using ConnecTel's automatic dialing and announcing device. Id. at *2. As plaintiff also points out, there is no mention in Hartman I or Hartman II of ConnecTel's location, or the importance thereof in relation to the application of WADA.

This likely is because WADAD's prohibition on using automatic dialing and announcing devices for commercial solicitation is aimed at the "person" using the device to do so, and not on the means – or in both this case and in Hartman I and Hartman II, the entity – through which the automated dialing and announcing device is employed. Accordingly, the situation here is not one in which there may be instances where an out-of-state defendant sent a prerecorded message to a call recipient who also is located out-of-state. Indeed, there is no dispute that at all times relevant to this case, defendant was located entirely within Washington. Nor is there any indication that at any time relevant to this case, defendant conducted its business anywhere but within Washington as well. Because the dormant Commerce Clause thus has not been implicated in this case, the Court therefore declines to find it necessary to adopt the interpretation of WADAD Judge Robart found was required to avoid rendering it unconstitutional.

The problem for plaintiff, though, is that he has defined the Washington State subclass in such a way that "the need for individualized hearings" on the issue of where each putative subclass member was located at the time a call was received has not been eliminated. Hartman II, 291 F.R.D. at 598. As noted above, that definition reads in relevant part: "All telephone

ORDER - 30

customers *within the State of Washington* who received a call . . ." ECF #1, p. 5, § 7.1 (emphasis added). Given that, as also noted above, no evidence has been presented showing where each putative subclass member was at the time each call was received, or that such a showing can be even made, the predominance requirement – and obviously, therefore, both the commonality and typicality requirements – is not satisfied for this additional reason, including with respect to the December 2009 "welcome" message.

    2.    <u>Superiority</u>

The second requirement of Fed. R. Civ. P. 23(b)(3) is that a class action must be "superior to other available methods for fairly and efficiently adjudicating the controversy." <u>See</u> <u>Ubaldi</u>, 2014 WL 1266783, at *9. "[A] non-exhaustive list of factors relevant to the superiority inquiry" is provided by that rule:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

<u>Bateman</u>, 623 F.3d at 713 (quoting Fed. R. Civ. P. 23(b)(3)); <u>see also</u> <u>Wolin</u>, 617 F.3d at 1175. "[A] broad inquiry is appropriate" in making this determination, and "[s]uperiority must be looked at from the point of view (1) of the judicial system, (2) of the potential class members, (3) of the present plaintiff, (4) of the attorneys for the litigants, (5) of the public at large and (6) of the defendant." <u>Bateman</u>, 623 F.3d at 713 ("Superiority must also be looked at from the point of view of the issues.").

"[T]he purpose of the superiority requirement is to assure that the class action is the most

ORDER - 31

1  efficient and effective means of resolving the controversy." Wolin, 617 F.3d at 1175 (quoting

2  7AA Charles Wright, Arthur Miller & Mary Kay Kane, Federal Practice and Procedure, § 1779

3  at 174 (3d ed. 2005)). It "requires the court to determine whether maintenance of [the] litigation

4  as a class action is efficient and whether it is fair." Id. at 1175-76 ("[U]nderlying [the superiority

5  requirement] is a concern for judicial economy."). "Generally, when a large number of plaintiffs

6  are seeking a small amount of damages, class certification is appropriate." Beaty, 2009 WL

7  192481, at *9; see also Zinser, 253 F.3d at 1190; Mace v. Van Ru Credit Corp., 109 F.3d 338,

8  344 (7th Cir. 1997) ("The policy at the very core of the class action mechanism is to overcome

9  the problem that small recoveries do not provide the incentive for any individual to bring a solo

10 action prosecuting his or her rights."); G.M. Sign, 2009 WL 2581324 ("[Where] there are a large

11 number of potential class members each with the same claim under the same statute and each

12 potentially entitled to a relatively small recovery . . . [d]eciding each claim separately would be

13 an extremely inefficient use of both judicial and party resources.").

14         Defendant offers no specific challenge regarding the issue of superiority. In addition, the

15 Court finds that requirement is met, as "[i]t is evident that there are potentially thousands of class

16 members with small claims," there appear to be "no other actions pending that relate to the issues

17 raised herein," and "[t]here is nothing in the record to suggest that concentrating the litigation in

18 this forum would be undesireable."[7] Zeisel, 2011 WL 2221113, at *11. Nor has any argument

19 been made regarding unmanageability. Id.; Campbell v. PricewaterhouseCoopers, LLP, 253

20 F.R.D. 586, 605 (E.D. Cal. 2008) ("Manageability concerns must be weighed against the

21 alternatives and 'will rarely, if ever, be in itself sufficient to prevent certification of a class.'")

---

[7] This last factor has been found to be met "where the potential plaintiffs are located across the country and where
the witnesses and the particular evidence will also be found across the country," such that there was no "particular
reason why it would be especially efficient for [the] Court to hear such a massive class action lawsuit." Zinser, 253
F.3d at 1191-92 (quoting Haley v. Medtronic, Inc., 169 F.R.D. 643, 653 (N.D. Cal. 1996).

1    (quoting <u>Klay v. Humana, Inc.</u>, 382 F.3d 1241, 1272 (11th Cir.)).[8]

2         Most importantly, "[w]ithout the availability of class relief, many class members would

3    certainly be 'unable to proceed as individuals because of the disparity between their litigation

4    costs and what they hope to recover.'" <u>Holloway</u>, 2007 WL 7698843, at *8 (quoting <u>Murray v.</u>

5    <u>GMAC Mortg. Corp.</u>, 434 F.3d 948, 955 (7th Cir. 2006)); <u>see also</u> <u>Cavin v. Home Loan Center,</u>

6    <u>Inc.</u>, 236 F.R.D. 387, 396 (N.D. Ill. 2006) ("[T]here is a strong presumption in favor of a finding

7    of superiority when the alternative to a class action is likely to be no action at all for the majority

8    of class members."). "Given the relatively small minimal amount of damages that an individual

9    may recover in suing for violation of the TCPA" and WADAD – $500 under both statutes – "a

10   class action would achieve" plaintiff's "objective better than if class members were required to

11   bring individual actions." <u>Knutson</u>, 2013 WL 4774763, at *10 (citing <u>Culinary/Bartender Trust</u>

12   <u>Fund v. Las Vegas Sands, Inc.</u>, 244 F.3d 1152, 1163 (9th Cir. 2001); 47 U.S.C. § 227(b)(3)); <u>see</u>

13   <u>also</u> <u>Beaty</u>, 2009 WL 192481, at *10; RCW 80.36.400(3).

14        F.    <u>Class Definitions</u>

15         1.          <u>Ascertainable Requirement</u>

16        "In addition to [the] requirements of Rule 23, the party seeking class certification must

17   provide a workable class definition by showing that the members of the class are identifiable."

18   <u>G.M. Sign</u>, 2009 WL 2581324, at *7. "[R]eference to objective criteria and reference to the

19   defendant's conduct can provide the basis for identifying members of the class." <u>Id.</u> "A class

20   definition should be 'precise, objective and presently ascertainable.'" <u>Agne</u>, 286 F.R.D. at 566

21   (quoting <u>O'Connor v. Boeing N. Am. Inc.</u>, 184 F.R.D. 311, 319 (C.D. Cal. 1998)). "While the

22   identity of each class member need not be known at the time of certification, the class definition

---

[8] <u>See</u> <u>Zinser</u>, 253 F.3d at 1192 ("[W]hen the complexities of class action treatment outweigh the benefits of considering common issues in one trial, class action treatment is not the 'superior' method of adjudication.").

must be 'definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member.'" Id.; see also Knutson, 2013 WL 4774763, at *5 ("Class certification hinges on whether the identity of the putative class members can be objectively ascertained; the ascertaining of their actual identities is not required.").

In determining ascertainability, therefore, the question is "whether the proposed class definition is definite enough to determine whether someone is a member of the class." Knutson, 2013 WL 4774763, at *5. "A class is ascertainable if it identifies a group of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover based on the description." Id. (citation omitted). Defendant argues plaintiff's proposed national class and Washington State subclass are not ascertainable, because plaintiff does not know: (1) which of defendant's customers were old Tacoma Dodge customers; (2) which telephone numbers provided by defendant's customers as a preferred method of contact are cellular telephone numbers; and (3) which of defendant's customers were located in Washington when a call was received. The Court will address these one at a time.

First, while plaintiff has not yet shown which of its customers were old Tacama Dodge customers, there is no indication that the identities of those customers cannot be ascertained based on either defendant's records or the call records of OneCommand from 2009. Second, as noted above, according to plaintiff's attorney, OneCommand has represented that all telephone numbers called on defendant's behalf were cellular numbers. Thus, presuming defendant used OneCommand to send messages to its customers via their preferred method of contact, which also as noted above defendant indicated it did, then the cellular numbers OneCommand called on defendant's behalf were the preferred method of contact.

ORDER - 34

On the other hand, as discussed above, the Washington State subclass is defined as "[a]ll telephone customers within the State of Washington who received a call on their telephone with a prerecorded message." ECF #1, p. 5, § 7.1. Also as discussed above, it is not at all clear that it can be determined which calls were received by which customers within Washington, let alone on an objective basis. Accordingly, the Court agrees with defendant that the Washington State subclass is not ascertainable for this reason.

Defendant further argues, and the Court again agrees, that plaintiff has another problem, this time with the definition of both classes regarding the December 2009 "welcome" message, in that he has not alleged sufficient facts with respect thereto in his complaint. See Anderson v. U.S. Dept. of Housing and Urban Development, 554 F.3d 525, 528-29 (5th Cir. 2008) ("Under [Fed. R. Civ. P.] 8(a), a complaint must . . . allege facts [so as to] put the defendant on notice as to what conduct is being called for defense in a court of law."). Plaintiff's complaint does not do so in regard to the period of time covering the December 2009 "welcome" message. Indeed, as presently worded, the class definitions contained therein do not cover the period of time for the calls made beginning in 2011 as well. Specifically, both definitions cover calls received "at any time in the period that begins four years *from the date of this complaint to trial*." ECF #1, p. 5, § 7.1 (emphasis added). Given that the complaint was filed on April 1, 2013, none of the calls plaintiff received are covered by either class definition. While this certainly may not have been plaintiff's intent, the Court is limited to the language of the complaint before it.

### 2.        "Failsafe" Class

Defendant also contends the national class is an improper "failsafe" class. A "failsafe" class happens "when the class itself is defined in a way that precludes membership unless the liability of the defendant is established." Olney, 2013 WL 5476813, at *11 (quoting Kamar v.

RadioShack Corp., 375 Fed. Appx. 734, 736 (9th Cir. 2010)); see also Sauter v. CVS Pharmacy, Inc., 2014 WL 1814076, at *4 (S.D. Ohio May 7, 2014) (class definition that "cannot be defined until the case is resolved on its merits" is impermissible) (quoting Young v. Nationwide Mut. Ins. Co., 693 F.3d 532, 538 (6th Cir. 2012)). Such a class "includes *only* those who are *entitled* to relief." Sauter, 2014 WL 1814076, at *4 (quoting Young, 693 F.3d at 538) (emphasis in original). It "is prohibited because it would allow putative class members to seek a remedy but not be bound by an adverse judgment – either those 'class members win or, by virtue of losing, they are not in the class' and are not bound." Id.

A "failsafe" class "is not only 'palpably unfair to the defendant'" for these reasons, "but it is also unmanageable because it is unclear in such cases to whom class notice should be sent." Ubaldi, 2014 WL 1266783, at *6 (quoting Kamar, 375 Fed. Appx. at 736). The existence of a "failsafe" class "constitute[s] an independent ground for denying class certification." Sauter, 2014 WL 1814076, at *5 (citing Randleman v. Fidelity Nat. Title Ins. Co., 646 F.3d 347, 352 (6th Cir. 2011)). As noted above, the national class is defined as:

> All persons in the United States who received a call on their cellular telephone line with a prerecorded message, initiated by or on behalf of Defendant, marketing Defendant's products and services, and *without the recipient's prior express consent*, at any time in the period that begins four years from the date of this complaint to trial.

ECF #1, p. 5, § 7.1 (emphasis added). But "[b]ecause the TCPA prohibits calls to cellular telephones using [an automatic telephone dialing system or an artificial or prerecorded voice] unless prior express consent has been given," defining the national class in this way "means that only those potential members who would prevail on this liability issue would be members of the class." Olney, 2013 WL 5476813, at *11; see also Sauter, 2014 WL 1814076, at *8-*9.[9]

---

[9] As the district court in Sauter explained:

ORDER - 36

Citing <u>Wolfkiel v. Intersections Ins. Servs. Inc.</u>, 2014 WL 866979 (N.D. Ill. Mar. 5, 2014), plaintiff asserts not all district courts agree on this issue. But while the district court in <u>Wolfkiel</u> stated it was "not yet persuaded" that such definitions produce impermissible "failsafe" classes, as it was "not clear to [the court] that [it] creates a situation where membership in the class is dependent upon the validity of a putative member's claim," that court offered no further explanation for its position. <u>Id.</u> at *6. This Court, however, is persuaded that inclusion of the "without prior consent" language in the national classes definition makes it a "failsafe" class, as clearly the issue of consent is central to determining defendant's liability. Plaintiff is correct, though, that rather than denying certification "simply because the initially proposed class is a 'failsafe' class," the "problem . . . should be resolved by refining the class definition" (<u>Sauter</u>, 2014 WL 1814076, at *9; <u>Olney</u>, 2013 WL 5476813, at *11), and to the extent such is possible, the Court shall grant plaintiff the opportunity to do so as discussed further below (<u>see</u> <u>Powers v. Hamilton Cnty. Pub. Defender Com'n</u>, 501 F.3d 592, 619 (6th Cir. 2007) ("[D]istrict courts have broad discretion to modify class definitions.").

CONCLUSION

Based on the foregoing discussion, plaintiff's motion for class certification (ECF #55) is DENIED. Specifically, class certification is DENIED as to the TCPA claims concerning the calls made beginning in 2011, in light of the Court's prior Order granting in part defendant's motion for summary judgment. Class certification also is DENIED as to both the WADAD and WCPA

---

If the Plaintiff successfully demonstrates that the Defendant made calls using an [ADAD] or an artificial or prerecorded voice to the class members' cell phones without the class members' prior express consent, then the class members win. *See* 47 U.S.C. § 227(b)(1)(A)(iii). However, if the Plaintiffs are unsuccessful in meeting their burden of proof, the class does not exist and the class is not bound by the judgment in favor of the Defendant. This is the definition of a prohibited fail-safe class. . . .

<u>Id.</u> at *9.

ORDER - 37

1  claims concerning the calls made beginning in 2011, in light of the Court's rulings regarding the

2  issues of commonality, typicality and predominance discussed above.

3       Plaintiff shall file an amended complaint by **no later than December 22, 2014**, seeking

4  to cure, if possible, the defects discussed above.

5       DATED this 24th day of November, 2014.

6

7

8

9

10  Karen L. Strombom
    United States Magistrate Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER - 38